Good morning. May it please the court, my name is Joanne Spaulding. I'm representing the Sierra Club in this matter. With me at council table are Robert Youngke and Pat Gallagher. Widening US 95 will bring one of the most dangerous sources of air pollution in the urban environment to within a few yards of the classrooms at Ruth Fife and Adcock Elementary Schools. The hundreds of children at these schools will be within the highest risk zone where scientific studies show that traffic levels expected on the widened highway increase the risk of asthma attacks, bronchitis, permanently reduced lung function, cancer and other health hazards. Federal Highway Administration has chosen commuter convenience over public health without ever considering the health risks posed by the most dangerous highway air pollutants and without ever evaluating alternatives that can provide efficient transportation while minimizing these health risks. I'd like to focus the court's attention this morning on three critical errors in the district court's analysis. First, the district court failed to recognize distinct substantive obligations of Section 109H of the Federal Aid Highway Act. Federal Highways has not addressed any of the relevant factors with regard to fine particles and air toxics in that statute. Second, the court overlooked the legal framework governing uncertainty in the analysis of environmental effects. Federal Highway Administration disregarded rules that require the agency to invest resources to address uncertain impacts. Finally, contrary to the district court's holding, the highway planning process can inform but not replace the required evaluation of alternatives in the environmental impact statement for US 95. The statutes at issue in this case are Section 109H of the Federal Aid Highway Act and the National Environmental Policy Act. Section 109 establishes substantive rules of law to be applied to highway decisions on a case-by-case basis. NEPA provides additional procedural requirements that supplement Section 109. Both govern individual highway projects that may have adverse environmental effects, including harmful effects from air pollution. Both statutes require consideration and disclosure of adverse effects of highway projects and evaluation of measures to eliminate or minimize those effects. Now, you have those claims that you've indicated, and then you also have a challenge with regard to the compliance with provisions of Section 128, correct? Yes. And on the challenges that you've just mentioned, you either have an abuse of discretion or an arbitrary and capricious standard, right? That is primarily correct, Your Honor, except that I believe that with regard to the supplemental EIS claim, the agency had an obligation to make a determination as to the significance of the new information, and that's a legal obligation that would be a reasonable standard. Okay. In other words, some of these are questions of law, aren't they? In other words, compliance with statute? It would have to do with the interpretation of the statute? Yes, and that's another – thank you, Your Honor, because with regard to Section 109, it is an abuse of discretion for the agency to not consider any of the relevant statutory factors. So it is an issue of law, but – No, no, but the first question is, you know, does the statute require those factors to be considered, right? Isn't that the first question we have to ask on 109? Yes. And then on that, it's de novo, except probably subject to the Chevron deference. That's – Is that – do you agree with that? Well, I believe that it's a question of is it – is – has the agency acted in an arbitrary and capricious manner? And yes, this Court reviews the district court's decision de novo. But as to the meaning of the statute, 109, that's de novo? That's de novo. Yes, Your Honor. Well, and then once then, I think it's – what is it, 23 U.S.C. 128? And as to the meaning of the statute, yes, that also is de novo. And if you're asking about standard of review in that case – I think the standard of review is different on the last part on that. What I – yes, I – I think the other might be more mixed. I under – everyone always wants de novo on everything, but – But with section 128, the – the Federal Highway Administration has argued that it is entitled to Chevron deference. And I think we've briefed that issue, but we believe that Chevron deference is inappropriate in that case because of the – there was no formal rulemaking that determined – I mean, there's no formal rulemaking or anything of that nature. Exactly. It was the Nevada Department of Transportation, Your Honor. So if I could – if the Court has – All right. I know you want to spend time on the – your first three challenges, but I'm going to – you can go ahead and do that. But I want to talk about the last one, too, so – Okay. I'll try and be quick, then. All right. Okay. The section 109 has additional substantive obligations beyond NEPA, and those are to make the final – the agency must make its final decision in the best overall public interest, balancing the need for safe and efficient transportation with the cost of eliminating or minimizing adverse effects. This public interest test is the critical substantive test in highway review. Federal highway regulations require also, in addition to the actual statutory requirements, that measures needed to mitigate adverse effects be incorporated into the project. Federal highways ignored these duties with regard to fine particles and air toxics. The agency performed no analysis of fine particles and air toxics, even though EPA considers these the most dangerous highway air pollutants, and federal highways had ample evidence of these dangers when it approved the project. Without this information, federal highways could not determine appropriate mitigation measures, ascertain the cost of these measures, or make a final decision in the best overall public interest. The agency did not even undertake even the first step required by section 109H to consider the possible adverse effects of fine particles and air toxics from the proposed project without considering any of the relevant statutory factors that requires that this court set that decision – that – Now, so does the district court find on that that, well, that the then current scientific modeling and available information could not provide meaningful findings on which to base the decision? The district court said that the agency determined that, but the agency – but that's actually inconsistent with both the statutory requirements and the agency's position. The statutory requirements, both in section 109 and NEPA, are that the agency must gather and evaluate information. It can't rely on the existing information. It can't rely on the current status of information. It must do the work and invest the resources necessary to obtain that information. And the agency has never said that that information is unobtainable. In fact, in the Savonis Declaration, in the record excerpts, the agency has a list of research tasks that will resolve this issue. And so to say that it's not feasible or possible is just not even consistent with the agency's own position. The district court supplemental environmental impact statement analysis is fundamentally flawed because it overlooked NEPA's rule for addressing uncertainty. A major point of dispute between the parties in this case is how uncertainty identified by Federal Highway Administration must be addressed. The regulations define significance to include the degree to which environmental effects are highly uncertain. That's 40 CFR 1508.27. There's a specific regulation that provides procedures for addressing uncertainty in the context of an EIS. That regulation is 40 CFR section 1502.22. The district court did not cite or address that regulation. Under 1502.22, the agency must invest resources necessary to fill information gaps. Specifically, the rule requires the agency to obtain information relevant to adverse effects unless overall costs are exorbitant or obtaining the information is not scientifically feasible. Even if the information is unobtainable, the agency must include in an environmental impact statement a statement that reviews the scientific evidence and provides the agency's evaluation of the impact. This court in National Parks and Conservation Association v. Babbitt held that environmental effects that are highly uncertain must be considered in an EIS if the uncertainty may be resolved by further collection of data or collection of data may prevent speculation. In making that determination, where does agency expertise come in here? The agency could have decided that it was not possible to resolve the uncertainty, but it didn't do that here. It just said that it did not currently have adequate information. It said it didn't have available data, but the rule and case law require further collection of data. And the record sites for the feasible research projects that the Federal Highway Administration itself identified are 856 and 859 through 60. It identified feasible research projects, many of which should have been completed by now. This establishes the agency's view that uncertainties can be resolved by research programs. Even if they said that the information is not obtainable, they must prepare a statement as required by Section 1502.22, and that statement needs to review the scientific evidence and provide the agency's evaluation of the impact. And the significance of doing that in an environmental impact statement is that rather than just the agency's own interpretation, it will serve the purposes of NEPA, because it will allow public input and it will allow the agency to publicly obtain input from other expert agencies. Tools are available to narrow the range of uncertainty regarding these hazardous health effects and to inform agency decision-making and the public. The inquiry required by Section 1502.22 is useful because it furthers the purposes of NEPA about informing government officials and the public about the serious health risks associated with highways and urban areas. The Supreme Court in March said that a supplemental EIS is required if new information shows that the remaining action will affect the human environment in either a significant manner or to a significant extent not already considered. This new information here shows that the project will affect the environment in both a significant manner and to a significant extent never considered by federal highways. The manner of impact is the risk of cancer, heart disease, and asthma attacks, which is unquestionably significant and federal highways has never argued otherwise. The extent of the impacts is the level of risk attributable to pollutants from the highway. The MATES II study and the expert report submitted by the Sierra Club demonstrate that the extent of these impacts are significant as well. Estimated cancer risks from only three of the many pollutants from the highway greatly exceeds the generally recognized standards for establishing significant public health risks. The Federal Highway Administration has explicitly acknowledged that it is not claiming that the project's air toxics impacts are not significant. It's based its refusal to consider these significant effects on the difficulties of precisely quantifying the risks, not on the belief that the nature or extent of the health effects are not significant. This court, again a National Parks and Conservation Association, held that when uncertainty relates to the intensity as opposed to the nature of environmental effects, an EIS is required. The uncertainty of the new information in this case is not related to the nature or manner of the impact. That is clearly significant and under Marsh and National Parks requires a supplemental EIS. The uncertainty is related, rather, to intensity or extent of the impact. That, too, requires a supplemental EIS because the new information shows that the extent is significant, NEPA uncertainty rules apply, and this court's holding in Price Road says that the threshold for preparing a supplemental NEPA document is significance or uncertainty. All right. I need to talk about Section 128 at this point. Okay. I'd be delighted to talk about Section 128. It's one of those things where the court hijacks in terms of that, obviously, that... My apologies, Your Honor. ...because that, all right, in terms of what you say has to happen, it doesn't plainly state that in the language of the statute. So... I'm sorry, Your Honor, which statute? Are we talking about 128 specifically? 128, yes. In terms of on the transcript, all right, what you're saying it has to have in terms of a transcript. Now, there isn't anything there that I can see specifically that says that every word has to be reported. It says a transcript. It does not say a verbatim transcript. The agency's original interpretation was a verbatim transcript, which was cited by this court, and I don't have the cite in front of me, but it's in our brief. And the agency subsequently changed its rules regarding that and just dropped the verbatim. What are the documents that we're talking about that said how the agency came to this? Didn't they reference that they have some internal memo or something, how they came to set up these open meetings or... Well, it's a complicated process, and it is described in the briefs, but the agency, there was a letter to the Nevada Department of Environmental, I'm sorry, the Nevada Department of Transportation that allowed, that basically said that the NDOT was allowed to use the open, these open house meeting style. And our biggest objection to the transcript is there's nothing in the transcript whatsoever from the agency. And it is a, these are statements made by members of the public, but they're not made in public. It's not a public hearing in that respect. They are made in private to a stenographer. And the only public hearing part of this is there is none. The transcript doesn't even include any of the agency presentation. And the, it is only these private conversations with the stenographer. Individuals do have an opportunity to meet with officials from the agency, but none of those are public in the sense that they're on the transcript recorded. They are private conversations in a room with other people where other people can overhear them. But our view is that that does not satisfy the requirements. And if you have no further questions, I'd like to take one more. I had a question which, it seemed to me you had an interesting argument in the district court based on some studies that expanding a highway didn't ever solve the problem because it just invited more traffic. So it was kind of a perpetual problem. You just, you made the highway bigger, and then you got increased traffic, and there you were again. Now, as I understand it, you dropped that in the appeal. Is that correct? We have, those are our induced demand claims, and we have not raised those on appeal. Is it something we can look at, or why did you drop it? Well, they are, you can look at it as part of our supplemental EIS claim that these, and actually as part of our alternatives claim because the traffic levels on the freeway are at issue. And in fact, Your Honor, as a factual matter, the newspaper has reported, and we have a document that I can submit to the court that's part of the regional transportation plan for Las Vegas area, and that shows that the traffic levels will be dramatically higher than they were predicted to be in the environmental impact statement. They're now, as of 2005, they are expected to exceed 300,000 vehicles per day. And so it just goes to show that there's, even without the widened freeway, there's still a much higher level of traffic. So those, the widened freeway will be subject to gridlock. Maybe I could make this a little more precise. When you didn't argue it on appeal, are we, as a legal matter, are we free to consider it? I think you're free to consider it to the extent that it affects our other claims, yes, and it does affect our supplemental EIS claim. With the court's permission, I'd like to reserve the last amount of my time. All right. Thank you. Your Honors, may it please the court. My name is Stephanie Tai, and I represent the United States. As I shall explain, Federal Highways Administration more than fulfilled its legal duties in approving a transportation project that, contrary to Sierra Club's characterization, integrates mass transit to meet Las Vegas' transportation needs. Highways used its expertise and reasonably considered the adverse effects of its air pollution through a single review process that complied with both the Federal-Aid Highway Act and NEPA. It considered additional studies provided by Sierra Club, but again, in its expertise, rejected their applicability to Las Vegas and found them insufficient to warrant additional studies under an SEIS. Highways fully and reasonably considered the fixed guideway alternative before rejecting it as inadequate to meet the project's purpose and need, and it also reasonably interpreted the Federal-Aid Highway Act as allowing open house hearings. Accordingly, the decision of the district court should be upheld. I'll go through the points raised by Sierra Club. First, Highways fulfilled its requirements under Section 109 of the Federal-Aid Highway Act and NEPA through an umbrella process in which Highways considered the potential adverse effects of air pollution pursuant to 109. Contrary to Sierra Club's characterization, it did look at fine particulate matter. It determined looking at EPA's standards that there were no standards available to address particulate matter, and in fact, by now, and we'll supply this in a 28-day letter to the court, EPA has determined that the Las Vegas area is in attainment for fine particulate matter. I'm sorry, is what? Is in attainment, so there are no problems with it. With the same umbrella review. Can we consider that? How would we consider that? That wasn't part of the record before the court. No, well, it just came out last Wednesday. So what you're saying is you were approved right later? Well, one of the two things, Your Honor. There have been many cases, for instance, over versus Whitman, which show that safety standards have been met as long as an area is in compliance with the National Ambient Air Quality Standards. Now, that just goes to what kind of effect this has. But there's also been studies that show that this is sort of correlated, that subsequent studies can remedy earlier defects if this court considers it a defect, which Highways doesn't, in terms of environmental studies that are challenged at a certain time. Well, what would your argument be if what you're citing to us recently had gone the other way? Would that affect what we can look at? If they had been arguing, you know, say if they got something positive from their standpoint and they were arguing the court to consider it, would you say we could consider it? I think what Highways would argue is that that would be a later consideration because what we're looking at is the record at the time the challenge was made. In terms of this later determination of attainment, that goes more towards like remedies. But in terms of what kind of challenge Sierra Club has, the only thing the agency can work with is what information was available to it at the time, and there were EPA statements that there are no standards yet available for fine particulate matter. I'll move on to the MSAT issue because that seems to be the multiple source air toxic issue because that seems to be the main issue of scientific contention here. Sierra Club acts as if Highways simply ignored their concerns, and Sierra Club focuses on uncertainty, but it glosses over the fact that even as initial matter, Highways determined that the studies proffered by Sierra Club were simply inapplicable to the Las Vegas area. Highways also took a hard look at all of these studies, and it even commissioned an outside consultant to evaluate whether or not the studies are applicable to the Las Vegas area, as well as the sort of importance of the information presented by Sierra Club. What you're saying is they considered them, but they didn't find them persuasive, and they're entitled to some deference for their agency expertise. Is that your argument on that? Yes, Your Honor. In fact, as a general matter, what Sierra Club's doing is providing a mere handful of studies, while Highways and in conjunction with the EPA, upon which Highways relied, looked at thousands of studies. And if you look at also saying you didn't do any of your own studies, did I hear that in the argument? They're saying gather information as if Highways has to perform individual scientific studies, but gather information is a term that involves both, you know, talking to other agencies, finding out what kind of scientific studies. In fact, NEPA expressly contemplates the coordination of environmental review with multiple agencies. So in terms of what Sierra Club is characterizing as gather information, I don't think that applies. I'll go through what Highways did when it looked at Sierra Club's studies. Sierra Club looked at, Highways looked at Sierra Club's studies, and they were focused around air toxics in the Los Angeles area, both the MATES 2 study, which it talks about a lot, and also the subsequent RSG and EHG studies are what they're called. And those also just basically re-review the MATES 2 study primarily. Highways found that differences in the composition of vehicle fleets, the topography, and the weather in Los Angeles precluded the direct transferability of MATES 2 to Las Vegas. And it wrote this in its first response to Sierra Club and its second response to Sierra Club. It also found that the types of concerns in the MATES 2 study were more region-wide concerns and are inapplicable or, you know, what Sierra Club characterizes as uncertain in terms of its applicability to project-level effects, which is what is of concern here, the US-95 project. Highways also found that other barriers exist for doing the type of risk examination sought by Sierra Club. Project-specific consideration is complicated by the fact that these mobile source air toxics disperse rather quickly, and there's no baseline in the Las Vegas area to compare what kind of emissions impacts there are. Sierra Club takes this and calls this additional studies that Highways concedes can be produced. But that's not the case at all. If you look at the record, what Highways is describing is a basic pattern of research that needs to be done, nothing to the extent of let's do this measurement, let's do this measurement, and we can find out the answer. No, these are sort of basic research directions. And in the progress of science, science does progress with this kind of not legal uncertainty, but rather sort of scientific uncertainty in the sense that certain data is not available and not even, you know, available as approximate matter. What about the, what's the response to the regulation quoted in the Sierra Club's brief? 1502.22. At the bottom of page 41? Yes. The 1502.22? Well, that regulation goes towards when, it goes towards what's required in an environmental impact statement. And so Sierra Club's kind of melding the requirements here because what. Well, this is not in, this is not in, this information is not in this environmental impact statement, is it? Right, and this is about the request for a supplemental environmental impact statement. And in terms of the request here, what Highways has to do as an initial matter is determine whether or not this kind of new information that Sierra Club is calling new information is even applicable to the Las Vegas area, and Highways did that. Highways looked at that information and determined that it's not even applicable as an initial matter. What do you mean? This regulation doesn't apply? It doesn't apply to the determination of whether or not to produce a supplemental environmental impact statement. It goes towards the contents of an environmental impact statement or a supplemental environmental impact statement, but there's a second, that's the second step it has to get to. It can't get there. It's not a requirement for what an agency has to do to decide not to produce a supplemental environmental impact statement. But isn't this the very reason why the Sierra Club asked for a supplemental statement? Excuse me? So isn't that an allegation that the environmental impact statement is deficient? The idea of a supplemental environmental impact statement is that either new studies or new circumstances have arisen since the production of the environmental impact statement that requires additional studies. Like the South Coast study, you mean? Right, right. They have two different challenges. They have that challenge, the requirement to produce a supplemental environmental impact statement, and that goes towards those South Coast studies. But then they have that other challenge that goes towards whether or not this sort of over-umbrella review that does Section 109 and NEPA complies. So you have to look at these two as two separate challenges. Going to what Sierra Club characterizes as uncertainty, Highways found that basically the state of the science isn't such that any kind of information useful to a decision-maker could be provided, which, as the Supreme Court recently recognized in Public Citizen, an EIS isn't required when the information provided would serve no purpose to a decision-maker. And here that's the case. What Sierra Club characterizes as uncertainty is simply what Highways found in its expertise to be the fact that no information could be provided. There's no unit risk level for diesel emissions. There's no way. Standard for that arbitrary and capricious? Yes, Your Honor. All right. And what about this shows that they were not arbitrary and capricious? What did? The letters that you look at and also the subsequent study commissioned with Sonoma Technologies, Your Honor. Those two put together demonstrate that basically Highways took a very hard look at Sierra Club's information. It gave a reasoned response in its letters, both of its letters to Sierra Club, and those reasons were confirmed by its outside commission. All right. So what you're saying is there were two viewpoints there. They looked at both of them, and they picked the one that was contrary to what Sierra wanted, and so therefore that's not arbitrary and capricious? That's the case, Your Honor. I'll move on, unless you have any further questions, about the mobile source air toxics or the fine particulate matter onto the alternatives study. In the alternatives study, Sierra Club, again, characterizes this as sort of an immediate rejection of any kind of mass transit proposal. That's not the case, Your Honor. If you look at the alternatives that are studied, even the one that was adopted includes mass transit. It wasn't the form that Sierra Club desires, but it includes HOV lanes and also increased level of busings, lanes specifically that are used for HOV riders and buses. This entire alternatives review was part of a large system of improvements coordinated with the state of Nevada. It integrates other state projects, and that's the major investment study process. With both state land use plans, like other transportation projects of the state, and although Sierra Club attempts to say, well, you can't rely on these quote, unquote, environmental studies of the state, that's not what Highways was doing there. Highways was relying on these determinations of whether or not the fixed guideway alternative met the purpose needs. But you don't have to consider every alternative, correct? Yes, Your Honor. You only need to consider what meets the project's purpose and need, and it was found that the fixed guideway alternative simply did not meet the purpose and need of the project. I'd like you to talk about Section 128. Yes, Your Honor. Has Highways adopted a public position on whether the open house meetings comply with the section? It hasn't adopted a position in a rulemaking, Your Honor. But it's been taking this position for quite a while, and I think it's set forth by some of the documents that I've put together. But there's no rule. What documents take this position? There's the study that was provided to the Highways Office of Environmental Policy. I think it's on Highways' website, but I'm not sure. And this court has specifically said that even if an agency's interpretation isn't entitled to Chevron deference by nature of it not being a rulemaking, an interpretation is entitled to the respect proportional to its power to persuade. And here Highways adopted a very reasonable position that actually these open house hearings would enhance the purposes of 128. Well, what type of transcript is made in an open house meeting, and does it fully reflect what went on? It documents the comments that are provided to a stenographer. It, let's see, I think provides an overall summary of the meeting that actually occurred, in which the Highways officials present the purpose of the project. All right. If we didn't feel that this open house meets the requirements of 128, what's the practical effect of that on this project? I think the, hmm, the practical effect on this project. If we find that you didn't comply with 128. If it didn't comply with 128, I think there's a lot of equitable discretion, actually, within the court to determine what kind of effect this has. I mean, if this court found that comments were excluded, you know, that would have changed the agency's mind, which EPA has made, you know, no showing whatsoever, then this court could possibly, you know, remand this back to the agency. However, this court, I think it's within its discretion to not do so, especially in this case where Sierra Club has presented no articulation of any kind of specific viewpoints that were excluded such that it would have changed an agency's decision. What do you mean by excluded? You mean the fact that a person was able to make the comment in the open house means it wasn't excluded? Is that what you're saying? Whether or not there would be a substantive difference in the types of comments that were provided. Well, are you sort of arguing harmless error here? I mean, if you're essentially saying that. In terms of equitable discretion, yes. Well, we're saying that open houses don't comply with 128. But what you're saying is that here it was harmless because in this particular, there's no showing that anything else would have. But how do you know if you're saying that this isn't good enough, how do you know what would have happened? Well, I think it's up to Sierra Club to present some kind of information like that. It's not just the opportunity to make the comments. It's the opportunity to be assured that the comments is going to get to the officials who have the power to decide. Right here, all you know is the stenographer is going to make a summary, and no one is going to even look at it. No, those are all provided to the decision maker. These summaries are provided. So that is actually not something that's not the case. If someone says something written, that will go. That will go. But other people there won't hear what that person, what the written statement was, right? That's the technical effect. The practical effect is that people have heard. You can tell from the types of comments that have been transcribed as people responding to other people's comments. But isn't the issue whether these open house procedures comply with 128? Yes, Your Honor. All right. And then if you make a statement the way that this is set up, if I want to go and I want to make a statement, the stenographer takes my statement down, but other people that are there aren't listening to it, correct? Yes, Your Honor, but there's nothing in 128 that talks about people having to hear other people. 128 talks about a public hearing. But public hearing can be interpreted in the sense that the public is open. It's open to the public. Well, it never has been until recently. But getting back to this meeting, how large are these meetings? How many people are there, a dozen, a hundred, a thousand? Your Honor, I'm not entirely familiar. I think it's ‑‑ I'm sorry, I'd be speculating, so I'm not familiar enough to give a number. Well, is there any other vehicle to, let's say, if the person shows up at this and says, I don't think this is a public hearing, that's not really going to do them any good there. Do they have to wait until it gets this posture in the case to challenge it? They can also provide that comment in, you know, there's been no comments made that they don't think that this is a public hearing. And people are able to provide these comments, not only talking to stenographers, but also writing it down. There's been absolutely no objection made in this record about that. And not only that, but in terms of the phrase town hall type hearings, which is what Sierra Club relies upon, there's plenty of legal case law that shows that town hall type meetings are construed as sort of quasi‑judicial, as in contrast to quasi‑judicial. If you didn't do a rule, we didn't really have a study or a comment period on the rule to say whether that would work, right? Right. So would you agree that if there are different kinds of Chevron deference, if you had a rule and you had public comments on the rule, you'd be in a better position than you are right here, correct? Yes, Your Honor. Is there a rule now, by the way? Is there a rule now? I don't believe that's the case. No? All right. I'd like to have a chance to ask you to respond to the induced traffic argument. You might not be prepared, but what is the agency view as to building highways only to have more traffic come to the improved highway? I would be entirely speculating right now because we did not brief this issue on appeal. Do you remember what Judge Proh said on that? Excuse me? Do you remember what Judge Proh said in his decision? You probably don't. I'd have to look at it again. He didn't deal with it very effectively. I think it's the subject that if we want to pursue it, we probably have to ask for more briefing. But it seemed to me an issue that this court picked up and dropped without much analysis. Your Honor, I'm — And as a user of highways, I have some sense this is what happens. As for highways, I mean, they looked at basically what they thought would be the level of traffic both without the highway and with it. And they determined that there would actually be less vehicle miles traveled using the US-95 project than without it, mostly because otherwise people are taking these circuitous routes around town and basically adding to the number of miles traveled. And this project does include mass transit, perhaps, again, not in the form that Sierra Club is requiring. But this isn't like a six-to-ten lane, as Sierra Club characterizes it, if you think about a lane as being a pure, you know, individual user lane. Only two of those lanes are dedicated to individual users, whereas two other ones are entirely dedicated to high-occupancy vehicles and to bus traffic. What's the definition of high-occupancy? I think it's two or more people. Two or more people, I think. Two. Is it? Yes. Could I just change your folks a little bit? There is some kind of a partial injunction pending appeal in effect right now, right? Yes, Your Honor. Now, what's the status of the project under that partial injunction? All of the widening that Sierra Club has been challenging has been on hold, Your Honor. But some other aspects of the construction have gone forward, right? Right. Things like drainage, things that will have sort of detrimental environmental effects if they're not. But not the actual construction of the new lanes. Right, not the widening. And actually, since my time is starting to run out, I should address that as well. What Sierra Club seeks is not actually innocuous. It will, in fact, harm the environment in a way that is both definite and knowable. Should highways need to engage in the types of reviews sought by Sierra Club, which requires the development of very basic science, the halted construction at this time will lead to higher congestion and to stop-and-go traffic, which will in turn lead to safety problems and actually more emissions. Plus, the temporary traffic control measures that are in place right now are not good for safety either. There are also costs to individuals due to the excess time spent in the car, again, because of the congestion, and also more emissions intaken by people as the congestion increases. In sum, highways is reasonable in its use of an umbrella environmental review process, its decision to not produce a supplemental environmental impact statement, its consideration of the fixed guideway alternative, and its approval of the open house forum format. Thus, this court should uphold the district's court decision and look to stay. Thank you. Thank you. I'd like to address a few points that have been raised. One is that the attainment standard for fine particles is not really relevant to this case. It's based on 2000 data. It's not based on future emissions. The fact that it's areas attainment now doesn't mean that the highway won't cause future violations, and the agency must determine whether the highway will cause future exceedances. The Sierra Club saw its duty in conveying to the Federal Highway Administration this new information for the Federal Highway Administration to prepare a supplemental SEIS. We saw our burden as to show the significance of impacts. We met that burden by showing that the risk levels will be comparable to traffic levels where the cancer risks are definitely within the range of significance established by the EPA, the Supreme Court, and Congress. The Federal Highway Administration's expert agreed with the Sierra Club experts and with the mates that study in many respects. The Federal Highway Administration's expert said that the comparisons of the air toxics pollutions between the highways depend on traffic volumes and differences in emissions factors. The traffic volumes may be comparable, but the emission factors in Las Vegas are actually higher. It also said that there were some qualitative conclusions from the mate study that are likely to be applicable to Las Vegas. And it also said it did not disagree with the Sierra Club's experts saying that the diesel emissions may be as much as 50 percent higher in Las Vegas than it is in Los Angeles. The standard to prepare a supplemental SEIS is governed by 1502.22. And this is useful, and under the Supreme Court's decision in public citizen, it is a useful endeavor to prepare a supplemental EIS to inform the government officials and the public about serious health risks. The STI study doesn't satisfy section 1502.22. It is not a NEPA document. Price Road and Idaho Sporting Congress v. Alexander require that the agency prepare a NEPA document. It made no attempt to assess the health effects of toxic emissions from U.S. 95, and it explicitly stated that the STI, the expert consultant, did not evaluate the tools available to perform such an analysis. I would suggest you wrap up in the next minute. Yes. Thank you, Your Honor. I wanted to just briefly say that, to Judge Noonan's question about induced demand, that because the traffic levels are so much higher than they were, and if this Court remands this decision, the agency will have to take those higher traffic levels into account. And then just briefly on alternatives, the Federal Highway Administration violated NEPA by failing to consider the environmental effects of the proposed project in comparison with the guideway alternative. NEPA regulations require that the EIS present the environmental impacts in comparative form. The major investment study in the highway planning process is not a substitute for NEPA compliance. Just because there's a locally preferred alternative doesn't mean that the Federal Highway Administration doesn't have its own obligation to analyze feasible alternatives. While the Federal Highway Administration can use data from that major investment study, it cannot misuse that data the way it has in this case. The Federal Highway Administration's reasons given for rejecting the guideway alternative are arbitrary and capricious. Thank you for your comments. Thank you. This matter will stand submitted. Court's now in recess. All rise. The Court is adjourned.
judges: Noonan, Tashima, Callahan